**UNITED STATES of America**

v.

**Karen Ruth GORDON.**

**UNITED STATES of America**

v.

**David R. WOODCOCK.**

**Crim. A. Nos. 85–50048–01, 85–50048–02.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 10, 1986.

U.S. Atty., Joseph S. Cage Jr. and Asst. U.S. Atty., Joseph G. Jarzabek, Department of Justice, Shreveport, La., for plaintiff.

Alfred R. Beresko, Rebecca L. Hudsmith, Shreveport, La., for Gordon.

E. Daniel Burt Jr., Kim Hanson LaVigne, Shreveport, La., for Woodcock.

### MEMORANDUM RULING

STAGG, Chief Judge.

To borrow the words of Chief Justice Earl Warren, "[t]his is another in a long line of cases presenting the question whether a confession [is] properly admitted into evidence.... As in all such cases, [the Court is] forced to resolve a conflict between two fundamental interests of society; its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement." *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1959). Due to the multiplicity of issues raised by this appeal of United States Magistrate James M. Barton's ruling denying defendants' motions to suppress, and due to the emotionally charged nature of much of the evidence involved in

this case, the resolution of these competing fundamental interests is particularly difficult in this instance.

Nevertheless, a determination must be made. After a review of the facts and jurisprudence, this court concludes that there has been no abridgment of either defendant's individual rights and that suppression of any incriminating statements would only serve to compromise society's interest in law enforcement.

## I  FACTS

Karen Ruth Gordon and David R. Woodcock are accused of murder and conspiracy to commit murder in connection with the death of Senior Master Sergeant Harry Michael Gordon, 18 U.S.C. §§ 1111 and 1117. Sgt. Gordon was found slain near Flagg Lake on the East Reservation of Barksdale Air Force Base, Louisiana ("BAFB"). Federal murder charges were filed because the death occurred within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 7(3).

The discovery, on October 27, 1985, of Sgt. Gordon's body occasioned a joint investigation by the Air Force Office of Special Investigations ("OSI") and the Federal Bureau of Investigation ("FBI"). The principal investigators for the OSI were Agents Travis Coleman, John Gravelee and Ron Kinzel. Late in the investigation, OSI Agent Joseph Walker traveled to BAFB from Maxwell Air Force Base in Alabama to conduct polygraph examinations. Agent Keith Aiken was the principal investigator for the FBI.

Sgt. Gordon was First Sergeant in the 1st Combat Evaluation Group stationed at Barksdale. His wife, Karen, was also employed at BAFB as a civilian Air Force Reserve technician. She held the rank of technical sergeant (Reserves) in the 78th Refueling Squadron. The Gordons were married ten years and had three children. David Woodcock was also a civilian Air Force Reserve technician employed at the Base in the 917th Tactical Squadron.

After making incriminating statements to the OSI during a polygraph test on November 17, 1985, Mrs. Gordon became a suspect in the death of her husband. She made additional incriminating statements the next day and named David Woodcock as the person who shot her husband. These statements led to the arrests of Mrs. Gordon and Woodcock on November 18, 1985. Both defendants moved to suppress these statements and other related materials. A four-day suppression hearing was held before the Magistrate who denied the motions to suppress. Both defendants appealed.

The various constitutional issues raised by the defendants in this case necessitate a comprehensive review of the law enforcement activities leading up to the arrest of both defendants.

### A  Saturday, October 26, 1985

Karen Gordon reported her husband as missing to the Barksdale Air Force Base law enforcement desk. The security police on duty there called OSI Agent Travis Coleman. Agent Coleman contacted another member of the OSI, Agent Ron Kinzel. These two OSI agents went to the law enforcement desk and had a brief interview with Karen Gordon. (Tr. 171.) Mrs. Gordon stated that her husband had received phone calls which led to his traveling to the East Reservation of Barksdale AFB on that day. This report was made between 8:00 and 8:30 O'Clock P.M. *Id.* Agent Kinzel testified that Mrs. Gordon appeared "nervous, although somewhat relaxed" and that she "chain smoked." *Id.* By the time the OSI agents arrived at the law enforcement desk, the Air Force Security Police had already started a search. Sgt. Gordon was not found that day.

### B  Sunday, October 27, 1985

The search for Sgt. Gordon re-commenced in the early morning hours. (Tr. 172.) At approximately noon or 12:15 p.m., his body was found. (Tr. 173.) The crime scene was secured, and the investigation began (Tr. 172–73.) At approximately 3:00 to 4:00 O'Clock P.M., an Air Force casualty

notification team informed Karen Gordon that her husband's body had been found. (Tr. 907–08.)

### C    Monday, October 28, 1985

FBI Agent Keith Aiken and OSI Agent John Gravelee went to the Gordon residence. These agents conducted a brief, one-hour interview of Karen Gordon and asked questions about the details of the days prior to her husband's death. (Tr. 49.) Mrs. Gordon was not read her *Miranda* rights because, at this time, she was not a suspect. (Tr. 47–50.) The agents were not trying to make a case against Karen Gordon. (Tr. 140.) They were trying to find clues for an unsolved murder. The agents informed Mrs. Gordon that her husband had been shot. (Tr. 264.) Karen Gordon was seen drinking beer by both the agents and other visitors to the house on this date. (Tr. 50, 209, 721.)

### D    Wednesday, October 30, 1985

On this date, Mrs. Gordon authorized a search of her home in which certain computer equipment belonging to her husband was taken by the investigating officials. (Tr. 265–66.) Agent Gravelee and two other OSI agents went to the house and took this equipment. (Tr. 260, 267–68.) This equipment was taken to search for possible clues. (Tr. 271.)

### E    Friday, November 1, 1985

Sgt. Gordon's funeral took place on this date. OSI Agent Coleman went to the Gordon house prior to the funeral and remained there during the funeral for the family's protection. (Tr. 991–92.) OSI Agents Gravelee and Kinzel attended the funeral to monitor who attended and to observe any unusual activity. (Tr. 272, 348.) Mrs. Gordon was drinking vodka at her home after the funeral and became intoxicated. (Tr. 210, 726.) Col. Billy F. Price, Sgt. Gordon's commanding officer, went to the Gordon home following the funeral. Karen Gordon expressed a strong desire to speak to him. (Tr. 215.) Mrs. Gordon expressed some fear of the OSI;

however, Col. Price told her not to tell him anything that she could not tell the OSI herself, and that the OSI could not take advantage of her. (Tr. 213–14.) Karen Gordon told Col. Price about her husband's pedophilia and abuse of her children and herself. (Tr. 211, 221–22.) She indicated that she was aware of Sgt. Gordon's pedophilia and abuse prior to their marriage. (Tr. 236.) Mrs. Gordon also indicated to Col. Price that her husband had hidden certain incriminating photographs prior to leaving the house on the day he was shot. Col. Price contacted the OSI office later that day and relayed the fact that Mrs. Gordon might have some information which would be useful in the investigation. Col. Price did not tell the OSI of the photographs which Sgt. Gordon had hidden. (Tr. 225, 232.)

### F    Saturday, November 2, 1985

Mid-morning (8:30 to 10:00 O'Clock A.M.) on this date, Mrs. Gordon met Col. Price at his office, and then the two of them went to the OSI office where Karen Gordon was interviewed from approximately 10:00 O'Clock until noon. Col. Price waited outside the interview room. (Tr. 227.) During this interview, Mrs. Gordon told the OSI agents about the child abuse in her home. (Tr. 273.) Apparently, Mrs. Gordon also informed the OSI of the photographs depicting child abuse which her husband had hidden shortly before he left the house on Saturday, October 26, 1985. (Tr. 273.) This interview resulted in a consensual search of the Gordon home. *Id.* FBI Agent Aiken and OSI Agents Coleman and Kinzel, accompanied by Mrs. Gordon and Col. Price, returned to the Gordon residence sometime around noon. This search lasted approximately five hours. (Tr. 68, 227.) Although the photographs of child pornography and of Sgt. Gordon engaged in a sexual act with a very young girl were found relatively early in the search, the agents continued the search, in part on the suggestion of Mrs. Gordon that other such photographs existed. (Tr. 180, 275.) The investigating officers continued looking for

the photographs because they provided a possible motive for the killing. (Tr. 276.) Col. Price, who felt as though he were a father figure for Karen Gordon, believed that nothing was taken at this search which should not have been confiscated by the officers. (Tr. 216.) In fact, Mrs. Gordon told him that she had no problems with the search. (Tr. 233–34.) On this date, Col. Price, in conversation with Karen Gordon, told her that her children could possibly be taken away due to her knowledge of the child abuse and her failure to report it. (Tr. 220, 235–36.)

### G  Monday through Thursday, November 4–7, 1985

Karen Gordon spoke on the phone several times with OSI Agent Gravelee and visited the OSI office located one block from her job on the base. No accurate record of the number of such calls or visits was developed.

### H  Friday, November 8, 1985

At approximately 10:00 O'Clock, Karen Gordon met with OSI Agents Gravelee and Coleman. She was told that this was a non-custodial meeting, that she could leave if she wanted to, and that she did not have to provide information to the investigators. (Tr. 280, 349.) The purpose of this 10:00 O'Clock meeting was to find out the amount of insurance covering Sgt. Gordon's life, to clarify some inconsistencies concerning the phone calls which he received prior to his death, to discover who else knew of the photographs or pedophilia, and to inquire whether she would be willing to take a polygraph. (Tr. 283–85, 358–59.) The purpose of the proposed polygraph was to confirm information Mrs. Gordon had previously given to investigators, to give the agents some "direction" in their investigation, and to learn who knew about the photographs or pedophilia. (Tr. 73, 280, 1026–28.) On this date, Mrs. Gordon also visited the base legal office to have insurance papers notarized. (Tr. 782.) While Mrs. Gordon was there, Col. John R. Shaughnessy Jr., chief legal officer for the

Base, saw her. When he saw her at the base legal office it "clicked" in his mind that she might need other help because her slain husband was the First Sergeant of his squadron and it is the First Sergeant's job to perform such duties. (Tr. 783–84.) Col. Shaughnessy was concerned that Mrs. Gordon's needs may have been overlooked. He suggested that she see a civil attorney at the base. (Tr. 784.)

At 3:00 p.m., Karen Gordon contacted the OSI and told them that she no longer trusted them and that she did not trust Agent Coleman. (Tr. 281–82.) She also stated that she would not take a polygraph. (Tr. 282.) From this point forward, Agent Coleman no longer had contact with Mrs. Gordon.

### I  Tuesday, November 12, 1985

On this date, Karen Gordon saw Capt. Wayne Webb at the base legal offices. Their meeting was brief and concerned succession problems related to Sgt. Gordon's death. (Tr. 870–72.) On the previous day, Capt. Webb was informed by Col. Shaughnessy that Karen Gordon was not a suspect and that he was to discuss only estate matters. (Tr. 869.) However, Col. Shaughnessy told Capt. Webb that he may have to divulge any information concerning the criminal case if Karen Gordon said anything incriminating. (Tr. 869–71.) Capt. Webb testified that he gave no credence to this last instruction (Tr. 869), and he was not asked to seek such information. (Tr. 887.)

### J  Wednesday, November 13, 1985

On this date, FBI Agent Aiken met with Karen Gordon at her home to discuss the possibility of her taking a polygraph examination. (Tr. 146.) Agent Aiken was selected because it was felt that Mrs. Gordon still trusted him. (Tr. 73, 358.) Agent Aiken did not visit Mrs. Gordon on this date in an attempt to make a case against her. (Tr. 140.) Rather, the visit was made because the investigating officers were faced with an unsolved murder with a number of possibilities. Agent Aiken told Mrs.

Gordon that the investigators needed "direction" and that she was a key to providing this direction. (Tr. 73, 83, 124.) He stated that the investigators needed to be "guided by what we can be sure of as solid fact." (Tr. 89.) A polygraph was also desired in order to clarify inconsistencies in information provided by Mrs. Gordon. (Tr. 73, 83, 86.) When she reported her husband missing and gave a statement to the OSI, Mrs. Gordon did not mention photographs. At that time, she indicated that the phone call which her husband had received that Saturday indicated that the caller had derogatory information concerning Randy Knowles, a possible suspect in the case. The next time she discussed this phone call, she indicated that the derogatory information concerned her husband rather than Knowles. (Tr. 82–83, 89.)

Agent Aiken told Mrs. Gordon that everyone is a possible suspect until they are ruled out, and that she, herself, could be classified as a suspect in that light. (Tr. 74, 123–24.) Karen Gordon indicated that she was a little displeased with the OSI because she felt that they did not believe her (Tr. 82.), and that there were things that she had not told the OSI or Agent Aiken including information about friends she did not want to involve. (Tr. 88, 142, 147.) Mrs. Gordon stated that she feared taking a polygraph because she might fail it since there were things she had not told the OSI. (Tr. 143.) While she seemed somewhat hesitant about taking the polygraph, she indicated that she would think about it some more. (Tr. 125–26, 146–47.)

It should also be noted that when Agent Aiken reviewed with Karen Gordon the various possible directions of their investigation, she told him that she thought that she saw a man who had been disciplined by her husband in the Air Force at the funeral home. (Tr. 144.) On this date, the OSI initiated surveillance of Karen Gordon in order to find out in whom she might be confiding and for her own protection. (Tr. 368, 1032, 1107.) The surveillance was discontinued the next day.

**K  Friday, November 15, 1985**

This day marked the beginning of a "UTA weekend," a weekend on which Air Force reservists are required to work as active duty members of the armed forces. (Tr. 301.) OSI Agent Gravelee called Mrs. Gordon at work and asked her to come by the OSI office. There, she was introduced to an OSI polygraph examiner by the name of Pearce. (Tr. 297.) The purpose of this introduction was to have Agent Pearce explain how a polygraph works. This meeting took between 30 and 45 minutes. (Tr. 300.) Karen Gordon refused to take a polygraph exam administered by Agent Pearce because she stated that she "had the book on him." (Tr. 298.) However, she agreed to take a polygraph exam if someone were available to do it quickly, and she stated that she would confirm this by the next day. (Tr. 373.)

**L  Saturday, November 16, 1985**

On this date, Karen Gordon was observed coming in and out of the OSI office. (Tr. 183, 192.) She also left many phone messages for Agent Gravelee. Agent Gravelee testified that he saw Mrs. Gordon and that she agreed to take the polygraph if she could review the questions prior to taking the exam. (Tr. 304, 308, 374.) Mrs. Gordon stated that she would even let Agent Pearce conduct the exam (Tr. 388); however, Pearce disqualified himself based on her comments of the previous day. (Tr. 384.) Later that day, Agent Kinzel went to the 78th Refueling Squadron in order to relay a message from Agent Gravelee to Karen Gordon concerning the scheduling of her polygraph for the next morning. (Tr. 185.) A Change of Command Reception was in progress at that time. Agent Kinzel stated that he did not know whether Karen Gordon had been drinking. (Tr. 186.) However, Karen Gordon's commanding officer in the Air Force Reserves stated that she had been noticeably drinking (Tr. 697), and another member of her squadron testified that she told him that she had been drinking since that morning. (Tr. 963.)

At 3:00 on this date, Mrs. Gordon stopped her friend, Rosa Terry, while they were both driving on the Base. Her friend warned Karen Gordon about talking to the OSI while drinking. Mrs. Terry testified that Karen Gordon's response was: "I don't have to worry. I just have a feeling that I'm going to be arrested anytime [,] anyway." (Deposition, 23.)

M  Sunday, November 17, 1985

### 1  Morning Polygraph

At approximately 10:00 O'Clock, Karen Gordon reported to the OSI office for her scheduled polygraph and met OSI Agent Joe Walker, who would perform the polygraph. From 10:15 to 11:30, Agent Walker conducted a pre-test interview of Mrs. Gordon. During this pre-test interview, Mrs. Gordon was read her *Miranda* rights (Tr. 501, 512), was told that she was free to leave anytime she so desired (Tr. 485), and was given a Consent to Polygraph form to read and sign. (Tr. 405–06, 501.) Karen Gordon was specifically told by Agent Walker that anything that she said could be used against her. (Tr. 512.) During this pre-test interview, biographical data concerning Mrs. Gordon was obtained, the test was explained, and the questions which would be asked during the polygraph test were discussed. (Tr. 405–06.) In his testimony, Agent Walker explained that the purpose of this pre-test interview is to calm the truthful and to heighten the anxiety of those who have given false information. (Tr. 407, 477.)

At approximately 11:30, Agent Walker connected Karen Gordon to the polygraph machine. This connection consists of two convoluted rubber tubes, one placed around the chest and one around the abdomen. A standard blood pressure cuff is placed around the upper part of the arm. Two small metal plates with wires are connected to the ring and index fingers. A small electronic transducer is placed on the thumb to measure the heart-beat rate. (Tr. 407.) The examinee is placed in a special chair designed to minimize movement. The Magistrate noted that this chair has fre-

quently been compared to the electric chair. (Tr. 408.) The polygraph room measures approximately 8 feet by 8 feet, has a separate air conditioning system, and is designed to be barren of distractions which might skew test results. (Tr. 411, 416.) Agent Walker sat approximately 4 feet behind Karen Gordon during the exam. (Tr. 411.) In accordance with Air Force regulations, Jeanne Turner, a female employee of the OSI, sat in the polygraph room during the entire examination. Her presence was required because a male was giving a polygraph exam to a female. (Tr. 729–30.) Four polygraph charts were run: one simulation chart and three actual charts.

Following the polygraph test, Agent Walker began a post-test interview. During this interview, he told Mrs. Gordon that deception was indicated in her answers and that this could mean either that she was not completely truthful or that she was involved in Sgt. Gordon's murder in some way. (Tr. 412.) Later, during this post-test interview, Karen Gordon said that certain friends had mentioned that someone should "get rid of" Sgt. Gordon or shoot him. (Tr. 413.)

From 11:30 until approximately 1:25, Karen Gordon remained connected to the polygraph machine. (Tr. 406.) At some point during the post-test interview, she asked to be disconnected; however, when Agent Walker explained that if they wanted to run a second polygraph, it would take 20 minutes to reconnect the machine, Karen Gordon agreed to remain connected. (Tr. 414.) At approximately 1:25 in the afternoon, Mrs. Gordon requested to terminate the interview and to talk to Agent Gravelee. *Id.*

During the post-test interview, Agent Walker laid his hand on Karen Gordon's. At that time, Karen Gordon clamped his fingers and held them so for 20 minutes. (Tr. 424–25.) Nevertheless, Jeanne Turner stated that she saw no evidence of sexual harassment during the polygraph and that, if anything, Walker was simply being friendly, as is his style. (Tr. 759–60.)

### 2 Afternoon Interview with Agent Gravelee

Karen Gordon both initiated and ended her conversation with Agent Gravelee on the afternoon of November 17, 1985. (Tr. 377–79.) When she came to his office to talk to Gravelee, she was upset and "cried some." (Tr. 316.) Agent Gravelee testified that this meeting was more in the nature of a conversation and that he "was not point blank asking question after question." (Tr. 362.) Karen Gordon stated that she loved her husband. Agent Gravelee thought that sympathy might come into play in obtaining useful information about the murder from Mrs. Gordon. (Tr. 362–63.) In an attempt to play on this sympathy, Gravelee placed photographs of Sgt. Gordon at the crime scene at Karen Gordon's feet as she was seated on the sofa in his office. Gravelee testified that as he did so, he asked Mrs. Gordon, "Would you let someone do this and leave him like that to the animals?" (Tr. 318–20.) In reality, no animals had disturbed Sgt. Gordon's body. *Id.* Agent Gravelee testified that he was not sure whether she had ever examined the photographs since they were at her feet and she covered her eyes. (Tr. 382.) During the course of this afternoon conversation, Karen Gordon told Gravelee that she knew who was involved in the murder of her husband, that the individual who shot him was not from the base, that she had not seen the man who shot her husband, that she had found someone to care for her, that she was "involved" with David Woodcock, that she was worried about the insurance money, that she had received threats since the murder, and that she may have talked to someone about her situation and that she could not have stopped the action. (Tr. 317–18, 326.) Karen Gordon also told Agent Gravelee that she was concerned about going to jail if she told him the name of the individual involved. (Tr. 326.)

### 3 Temporary Detention

At approximately 4:40 O'Clock P.M., Karen Gordon indicated that she wanted to leave the OSI office. This terminated her interview with Agent Gravelee. At this point, Agent Walker was called in and told Karen Gordon that agents had gone to interview David Woodcock and that, for the safety of the agents and Mr. Woodcock, she was asked to remain in the OSI offices until the agents radioed in that they had left Mr. Woodcock's home. (Tr. 418, 506.) In 20 to 30 minutes, the agents radioed in. (Tr. 418–19.) During the period of this temporary detention, the OSI agents stated that they would not have physically restrained her from leaving. (Tr. 339.) Throughout this period, no questions concerning the case were asked of Mrs. Gordon. (Tr. 381, 419.)

After the agents had radioed in, Mrs. Gordon was told that she could leave. At that point, she stated that she really didn't want to leave; she really just wanted to get cigarettes at a base "shopette." (Tr. 419, 506.) Agent Walker testified: "I had asked her if she wanted [,] after getting a pack of cigarettes ... [,] to continue to discuss the matter with us [,] and when she replied yes, I volunteered we would take her and get the cigarettes." (Tr. 419–20.)

Thus, from approximately 5:00 until 5:30 P.M., Karen Gordon waited at the OSI office for the agents to radio in their completion of their interview with David Woodcock. From approximately 5:30 to 5:40, she and Agents Gravelee and Walker, took a trip in an OSI car for cigarettes. At approximately 5:45, they returned to the OSI office. Mrs. Gordon was told that she was free to go or, if she wanted, she could return to the OSI office. In order to make sure that Mrs. Gordon wanted to return to the OSI office, Agent Walker had Agent Gravelee enter the building in which the OSI offices were located. Agent Walker then followed Agent Gravelee into the building and up the stairs. Karen Gordon was left in the parking lot alone, in order to be certain that she was returning to the OSI office of her own accord. (Tr. 420–21, 507.)

The OSI agents offered to obtain food for Mrs. Gordon on Sunday, but she refused. (Tr. 340.)

4  Evening Interview with Agent Walker

Karen Gordon returned to the OSI office after having been left alone in the parking lot.  When she returned to the OSI office, she began talking to Agent Walker.  Walker told her that she was free to go if she wanted, and he read her her *Miranda* rights.  (Tr. 508.)  At this point, Agent Walker knew nothing of the incriminating statements that Mrs. Gordon made to Agent Gravelee that afternoon.  (Tr. 423, 482.)  Nor did Agent Walker know anything of Mrs. Gordon's romantic involvement with David Woodcock.  (Tr. 489.)

This interview lasted approximately an hour and a half.  (Tr. 426).  It was conducted in Agent Gravelee's office.  Karen Gordon sat on a sofa in the office and Agent Walker occupied a chair.  (Tr. 423.)

Agent Walker testified that he maintained a general attitude of sincerity, friendliness and concern during the interview.  (Tr. 429.)  During the course of the interview, Walker told Mrs. Gordon that she was in trouble because of the deception on her polygraph.  (Tr. 483–84.)  He told her that perhaps she was not personally involved and asked how could this happen to a nice girl.  Agent Walker asked her to tell him hypothetically, "not real life," how she had gotten into this trouble.  (Tr. 426–27.)  She told him a third person story about a girl, whose husband was abusing her and her children.  She told him about a friend that this girl had become attached to who indicated that someone should get rid of her husband and volunteered to do it himself.  (Tr. 427.)  Agent Walker then asked if the hypothetical was really Karen Gordon, and Mrs. Gordon responded, "yes."  (Tr. 429–30.)  Agent Walker told Karen Gordon that her friend was not really looking out for her, and that he was not sincere.  (Tr. 428.)  Mrs. Gordon revealed that she had been giving money to this friend, just as a friend.  (Tr. 430.)

Agent Walker stopped the interview because of the lateness of the hour.  Karen Gordon told him that he looked tired, but stated that she could go on talking.  (Tr. 431, 509.)  In fact, the interview was termi-

nated by Agent Walker before 8:00 P.M. (Tr. 431.)

After the interview was terminated, Mrs. Gordon and Walker discussed general topics while waiting for housing arrangements.  (Tr. 437–38.)  At this point, Mrs. Gordon told Agent Walker that she would have said that she "had the book on" any polygraph examiner whom she had met on November 15.  (Tr. 1281.)  She stated that she felt the polygraph would implicate her, and that on November 15, she needed a valid excuse to explain why she would not take the polygraph.  (Tr. 1287.)

Karen Gordon was provided billeting on the base that evening because she had told Agent Walker around 7:30 that evening that she feared she was "next on the list." (Tr. 435, 485.)  This base billeting was provided as a convenience to Karen Gordon.  She was free to go; no one checked on her during the night.  (Tr. 516.)  On the way to the billeting, Mrs. Gordon insisted on obtaining beer.  This beer was obtained for her at the billeting office after she had threatened to obtain it herself.  (Tr. 439.)

N  Monday, November 18, 1985
1  Morning Polygraph

At approximately 4:00 or 5:00 O'Clock A.M., Karen Gordon left her base billeting, returned home and put on her uniform.  (Tr. 486.)  At 7:00 a.m., she picked up her children at the home of her friend, Rosa Terry, and took them to a nursery.  (Deposition, 27–28.)  She reported to work and told her commanding officer in the reserve unit in which she worked that she would be serving, on that Monday and Tuesday, two of her 15 required active duty days.  At approximately 8:30 A.M., Agent Gravelee called Mrs. Gordon's office and asked her to report for a second polygraph.  (Tr. 440.)  From approximately 8:45 until 9:30 A.M., another pre-test interview was conducted.  (Tr. 441.)  Mrs. Gordon was again given her *Miranda* rights, and signed a Consent to Polygraph form.  (Tr. 510.)  This was the third time that Agent Walker had given Karen Gordon her rights, and again, she was specifically told that anything that she

said could be used against her. (Tr. 446, 492, 510.) Karen Gordon initialed the rights on this form as she read them. (Tr. 492.) Agent Walker conducted a simulation test to see whether the beer or simple lack of sleep had effected Mrs. Gordon's ability to respond on a polygraph machine. This simulation test revealed that she was able to so respond. (Tr. 444–45, 504.) Agent Walker stated that he had no personal observation of tiredness at this point. (Tr. 504.) In fact, he stated that she seemed more cheerful this Monday morning. *Id.*

The actual polygraph test took approximately 15 minutes. (Tr. 445.) The test consisted of several names being placed on the wall. Karen Gordon said nothing; however, when Agent Walker read out the names, the polygraph machine registered Karen Gordon's reaction. This system was devised in order to discover the identity of Mrs. Gordon's friend, without the necessity of her having to break a solemn promise to that friend. During the pre-test, she asked several questions about how this would work. (Tr. 740.) The polygraph was completed at approximately 10:15 A.M.

From approximately 10:15 A.M. until noon, Agent Walker conducted a post-test interview. (Tr. 447.) At this time, Agent Walker wrote down on a piece of paper the hypothetical which Karen Gordon had related to him the previous evening. He rewrote that hypothetical as a first-person statement and had it typed up for Karen Gordon's signature. (Tr. 434.) During this time period, it took approximately 20 minutes for Mrs. Gordon to look over and correct this statement. (Tr. 447.) For example, she corrected the amount of money which she gave to her friend. (Tr. 448.)

At approximately 11:30 A.M., Agent Walker confronted Mrs. Gordon with the test results and attempted to get her to name David Woodcock. (Tr. 448.) Agent Walker told Mrs. Gordon that David Woodcock was not sincere and that he was only interested in the money. Agent Walker became tired of talking, in Jeanne Turner's words, "irritated," and walked out of the room. No witness testified that Agent Walker was angry or abusive. When Agent Walker left the room, Karen Gordon followed him out and told him the name of the individual involved. (Tr. 449.) She then wrote that name on the back of the statement she had signed. (Tr. 450–51.) It appears that she was almost apologetic to Agent Walker for not having disclosed the name earlier. (Tr. 518.)

Agent Walker offered lunch to Mrs. Gordon and she declined because he would not have lunch with her alone. (Tr. 452–53.) At 12:30 P.M., Mrs. Gordon asked to leave and was prohibited from doing so. At 1:00 O'Clock P.M., she was arrested by FBI agents at the OSI office. (Tr. 454.)

2 The Arrest and Monitored Calls

Karen Gordon was arrested by FBI Agents Hudson and Orr. The *Miranda* rights were read to her in the car while she was being transported from the Barksdale Air Force Base to the FBI offices in the federal building in Shreveport, Louisiana. (Tr. 1264.) Karen Gordon was booked and printed at 2:00 O'Clock P.M. (Tr. 92.) She was advised of her rights and would have been allowed to call an attorney. (Tr. 92, 95, 966.) FBI Agent Aiken testified that Karen Gordon did not look any different that day than on any other day he had seen her, but that she did look a little tired. (Tr. 93.) Specifically, Agent Aiken testified that she did not look like she had been drinking. (Tr. 94.)

Mrs. Gordon was allowed to smoke. (Tr. 102.) She was offered food which she declined. (Tr. 103, 1251.) At no time did she request beer. (Tr. 103.) In the late afternoon, at approximately 5:00 P.M., Agent Aiken approached Mrs. Gordon with the idea of having her place a monitored call to David Woodcock. (Tr. 94.) The purpose of this phone call was to verify her information and to obtain evidence on David Woodcock. (Tr. 97, 133.) The idea of obtaining additional evidence against Karen Gordon was considered a remote possibility, at best, because she had already signed written statements. (Tr. 133.) When approached by Agent Aiken about the phone

call, Mrs. Gordon told him, "I guess I have no choice." (Tr. 97.) Agent Aiken testified that he immediately corrected her and told her that her decision to place a monitored call to David Woodcock would be "strictly voluntary," and that she could "tell us to jump in the lake." (Tr. 100, 135, 142.) Agent Aiken testified that he made no promises concerning this phone call (Tr. 100, 134), but that he probably said that the court could consider this fact and that it could be brought to the attention of the United States Attorney. (Tr. 101, 134.)

By this time, OSI Agent Walker had arrived at the FBI office. Karen Gordon scolded Walker for not having said "hello" to her when he first came into the office. (Tr. 457.) Agent Walker testified that this level of friendliness from someone who had just been arrested was not unusual in his experience. (Tr. 495, 514–15.) Mrs. Gordon requested that Walker be present for the telephone calls. (Tr. 458–59.) He was present and may have held her hand during the first call. (Tr. 1260.) Two calls were placed that evening, one from inside the FBI offices and the second from outside the FBI offices in a public phone booth on a busy street. Mrs. Gordon signed consent forms which stated that her participation in the calls was voluntary and contained a statement of her rights. (Tr. 165.) After the phone calls were completed, Karen Gordon was taken to the Magistrate's house for arraignment at approximately 9:00 O'Clock P.M.

### O  When Did Karen Gordon Become a Suspect?

The OSI and the FBI conducted a joint investigation into the shooting death of Sgt. Gordon. The OSI officers assumed the primary role in the investigation because they had greater manpower and because the death occurred on the base. (Tr. 43.) The FBI's jurisdiction became primary as soon as it was ascertained that civilians were involved.

The testimony from the investigating officers was uniform: Karen Gordon was not a suspect until the first day she took a polygraph, November 17, 1985. Her commanding officer testified that he "put two and two together" and that he felt that she was a suspect (Tr. 690); however, this witness admitted that this was mere "supposition" on his part. (Tr. 712.) In fact, Col. Mickley's supposition that Karen Gordon was a suspect is entirely unfounded. The investigators interviewed over 170 people regarding Sgt. Gordon's death. These interviewees far outnumbered the people interviewed from Karen Gordon's squadron with whom Col. Mickley was familiar. Further, the investigators were pursuing a number of possibilities: a shooting related to the disciplinary aspect of Sgt. Gordon's position as first sergeant; an accident; and the possibility that the father or a relative of the girl depicted in the photos with Sgt. Gordon possibly committed the murder. (Tr. 72, 76, 143–44, 151.)

The proof that Karen Gordon was not a suspect in the case comes from the testimony of Agent Walker, who came into the case on Saturday, November 16, 1985. He testified that the OSI officials told him that they *only* suspected Mrs. Gordon of withholding information. (Tr. 483–84.) Further, the investigation was headed by the OSI and not the FBI. The FBI would be the primary investigative force if civilians, such as Mrs. Gordon, and David Woodcock, were suspected.

### P  Drinking/Eating/Physical Condition of Mrs. Gordon

Many people testified that they saw Mrs. Gordon with beer during the period immediately after her husband's death; however, no one testified that this drinking rendered her intoxicated except on the day of Sgt. Gordon's funeral. Her drinking and eating problems were noticed by her sister as far back as Christmas 1983. (Tr. 717–18.) Based on testimony from Dr. Lenore Walker, who testified as an expert for Mrs. Gordon, the eating problems may, in fact, date all the way back to Karen Gordon's adolescence. (Tr. 540.) At no time did Karen Gordon request food or drink of any kind from the OSI and the FBI and be

refused. On the contrary, she was offered meals and declined to accept. The seriousness of her eating disorders are demonstrated by the fact that her height is 5'6" and she weighed 88⅓ pounds on October 17, 1985. (Tr. 854.)

### Q  Friendliness on the Part of Investigating Officers

All investigating officers testified to maintaining a friendly and concerned attitude toward Karen Gordon. This attitude is not surprising in light of the fact that she did not become a suspect until after she revealed during post-polygraph interviews on Sunday, November 17, 1985 that she knew who shot her husband.

From the point of view of the investigating officers, it appeared that Mrs. Gordon had a special affinity for Agent Walker. FBI Agent Aiken testified that he did not believe that Mrs. Gordon felt close to him or to Agent Gravelee of the OSI. (Tr. 155.) The point of view of Mrs. Gordon appears to have been quite different. She told both a co-worker and a friend that the OSI agents were her friends. (Tr. 961, Deposition of Rosa Terry at 20.) Although Agent Gravelee testified that he felt that Mrs. Gordon came to consider him a friend (Tr. 289), there was no prior relationship between the two. Agent Gravelee attended an NCO academy with Mrs. Gordon's husband in May or June of 1982 in Germany, a full three years before the incident giving rise to this investigation. (Tr. 252–53.) Agent Gravelee testified that he may have met Mrs. Gordon twice during the time period of the academy. *Id.* Rosa Terry, Mrs. Gordon's close friend, did not list Agent Gravelee among the friends of the Gordons at Barksdale Air Force Base. Thus, there is absolutely no foundation in fact for Dr. Walker's conclusion that the investigation was conducted unethically due to a personal friend being one of the investigators of Karen Gordon. Any exaggerated sense of friendship on the part of Mrs. Gordon was entirely related to her own idiosyncratic perceptions, and not as a result of any overt actions on the part of the investigating officers.

### R  Karen Gordon's Perception of Coercion

Until the day of Mrs. Gordon's arrest, Sgt. Gordon's commanding officer, Col. Price, stayed in contact with Mrs. Gordon. He testified that he was a father figure for her. At no time did she ever complain to him about coercion, or any ill treatment whatsoever, on the part of the OSI or FBI. (Tr. 247.) Col. Price testified that he would ask her specifically about this. (Tr. 235, 241–43.) Although her friend, Rosa Terry, found it strange, Karen Gordon did not complain to her about the OSI. (Deposition, 58–59.) Both Mrs. Gordon's CO and her best friend told her to consult an attorney. (Tr. 701–02, deposition of Rosa Terry, 43.) Apparently, she saw no need to do so because the record reflects that she did not follow this advice.

## II  CONSTITUTIONAL CLAIMS BY KAREN GORDON

Mrs. Gordon claims that her Fifth Amendment protections against self-incrimination and the deprivation of liberty without due process will be violated by the admission of her statements made on November 17–18, 1985. An understanding of the origins and purposes of the rights which she has invoked is essential for a proper analysis of her claim.

### A  General

The Fifth Amendment provides, in part:

No person shall be ... deprived of life, liberty, or property, without due process of law....

This Due Process Clause renders inadmissible any confession which is not "the product of a rational intellect and a free will." *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). *See also Moran v. Burbine,* —— U.S. ——, 106 S.Ct. 1135, 89 L.Ed.2d 410

(1986) (fundamental fairness also guaranteed by the Due Process Clause).

Involuntary confessions are inadmissible under the Fifth Amendment. They are inherently untrustworthy. *Spano v. New York,* 79 S.Ct. at 1205. They offend notions of acceptability in a society which has rejected the inquisitorial method of prosecution. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 1619–20, 16 L.Ed.2d 694 (1966). In cases of police coercion or brutality, they also violate our society's fundamental notion that government agents must strictly adhere to the laws which they enforce. *Miranda,* 86 S.Ct. at 1630–31; *Spano,* 79 S.Ct. at 1205–06.

The Fifth Amendment also provides:

No person shall be ... compelled in any criminal case to be a witness against himself....

This privilege against self-incrimination was broken from the shackles which tied it to strictly testimonial settings by *Miranda v. Arizona.* The *Miranda* court realized the inherent potential for coercion in custodial police interrogation. 86 S.Ct. at 1618. To counteract this coerciveness, the *Miranda* court decreed that before any custodial police interrogation could commence, the individual had to be advised of his rights. *Id.* at 1612. These rights constitute the now-familiar *"Miranda* warning": "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Any statement given in the absence of the *Miranda* warnings need not be, in fact, involuntary. Rather, the absence of *Miranda* warnings "affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 1292 n. 1, 84 L.Ed.2d 222 (1985). In effect, there is an irrebutable presumption of involuntariness in these cases. *Id.* 105 S.Ct. at 1292.

Subsequent Supreme Court decisions make it clear that the *Miranda* decision, in itself, creates no rights. *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 2631,

81 L.Ed.2d 550 (1984); *see also Elstad,* 105 S.Ct. at 1292. The procedures required by *Miranda* are what has been termed "prophylactic" measures. *Quarles,* 104 S.Ct. at 2631. The *Miranda* warnings protect other rights directly guaranteed by the United States Constitution. Specifically, the *Miranda* warnings protect an individual's Fifth Amendment right not to be compelled to be a witness against himself. *Elstad,* 105 S.Ct. at 1292. The presence of counsel which *Miranda* recognizes as a "right" is to safeguard the individual's Fifth Amendment privileges. As in other situations, the *Miranda* counsel is interposed as a buffer between the individual and the police to protect other rights directly provided in the Constitution. *Miranda,* 86 S.Ct. at 1625; *see, e.g., United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (providing for counsel during police lineups). Any statement given in the absence of counsel is *not* irrebutably presumed to be involuntary. Rather, the *Miranda* court ruled:

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

86 S.Ct. at 1628. The burden of proof is always on the government. *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (*per curiam* ). The Supreme Court has noted that "courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Waiver may never be presumed and *Miranda* will also be violated by any ruling which shifts onto the defendant the burden of proving an invalid waiver. *See Tague, supra.*

To a certain extent, the analysis under *Miranda* is more "refined" and "technical"

than that under the application of the Due Process Clause. *Miranda* litigation involves questions of "how," "when," and "where" to apply the warnings and "what" constitutes a knowing and intelligent waiver, whereas due process litigation involves the simple, straightforward inquiry: was this confession voluntary?

The Fifth Amendment protections of a citizen's right to due process and privilege against self-incriminations raise numerous questions. What is "custody"? When is police questioning "interrogation"? What and when is a "custodial interrogation"? What is an adequate "warning"? When is a waiver "knowing and intelligent?" When is a confession the product of "rational intellect and free will"? Mrs. Gordon raises no issue concerning the adequacy of the warnings administered on November 17 and 18, 1985. Nor is there any doubt that she was subjected to interrogation. Thus, this court must determine whether she was in custody, whether she knowingly and intelligently waived her *Miranda* rights, and whether her statements on the days in question were voluntary.

### B Custody

The issue of whether Karen Gordon was in custody when she made incriminating statements on November 17 and 18, 1985, obviously applies only to her claims under *Miranda v. Arizona.* The *Miranda* court defined "custody" as follows: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 86 S.Ct. at 1612. Subsequent Supreme Court decisions have refined this definition of custody. *See California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam* ); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*per curiam* ); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Mrs. Gordon argues, "Once it is established that *Miranda* warnings were given, the issue is no longer one of whether 'custodial

interrogation' occurred but whether the defendant knowingly, intelligently and voluntarily waived those rights and voluntarily made incriminating statements. *See United States v. Brown,* 569 F.2d 236, 238–39 (5th Cir.1978)." (Brief at 6–7.) A close reading of the Fifth Circuit's *en banc* decision in *Brown* reveals that it does not stand for the proposition for which it was cited. That case involved a question concerning the voluntariness of the defendant's waiver of the presence of counsel. *Brown* was not a case which required the Fifth Circuit to define "custody". In fact, the *Brown* court noted that the setting of the police questioning "was a public corridor, however, and not a forced or custodial interrogation." 569 F.2d at 239.

■ The Supreme Court has never extended the *Miranda* warning requirements in the manner suggested by Mrs. Gordon in her brief. To suggest that the mere administration of the *Miranda* warning converts a legally non-custodial situation into "custody" is to completely strip from *Miranda* its original intention which was to protect a citizen from the coercive effects of police custody. The Supreme Court has noted:

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for the purposes of receiving of *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*California v. Beheler,* 103 S.Ct. at 3519–20 (citing *Mathiason,* 97 S.Ct. at 714).

■ Although the Supreme Court has recognized that special circumstances might compel a court to characterize a given situation as being custodial, the present case is not one of them. This line of "special circumstances" reasoning appears to be directed more to the situation of an individual whose ability to leave or prevent questioning has, in fact, been overcome due to police conduct. *See, e.g., U. S. v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311

(1969). Interrogation is not "custodial" simply because it took place in the station house. *Mathiason*, 97 S.Ct. at 714. Nor is a situation converted into custody "because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Beheler*, 103 S.Ct. at 3519 (citing *Mathiason*, 97 S.Ct. at 714.) Questioning is not "custodial" because the person questioned is one whom the police suspect. *Mathiason*, 97 S.Ct. at 714. Finally, a lack of awareness of the consequences of police questioning does not render that questioning "coerced" or "custodial". *Beheler*, 103 S.Ct. at 3520 n. 3.

■ Applying this jurisprudence to the facts of this case, the court is convinced that the questioning of Karen Gordon on November 17, 1985 was non-custodial. On this date, Karen Gordon was repeatedly told by the OSI investigators that she was free to leave and that she was under no obligation whatsoever to disclose information to them. She was not arrested on November 17. She was, however, briefly detained for no more than 30 minutes while the agents questioned David Woodcock in the late afternoon. The testimony revealed that she would not have been physically restrained from leaving at this time, and that she was asked no questions while being detained for the protection of Woodcock and the FBI and OSI agents. This brief detention was not for an improper purpose, but rather served to prevent a perceived danger of loss of life that might result from contact between Karen Gordon and David Woodcock at the time the agents were at Woodcock's house to question him. There exists no authority to support the proposition that this brief, protective, non-physical detention should taint the events of the rest of the day and convert them into a "custodial" situation. *See Oregon v. Elstad*, 105 S.Ct. at 1293.

Counsel at the suppression hearing developed an extensive record concerning the circumstances of Mrs. Gordon's questioning on November 17, 1985. None of these circumstances convert the questioning on that day into "custodial interrogation." Whether she was a suspect is immaterial. Her status as an active duty military member that weekend is also legally insufficient to convert her questioning into custody. The defendant in *Mathiason* argued that the state's authority over him as a parolee under supervision rendered his questioning custodial. The court rejected that argument. Thus, it seems clear that under Supreme Court jurisprudence, the "status" of an individual citizen is not a relevant factor in assessing whether the questioning took place in custody. It is true that for a brief period of time Karen Gordon was connected to a polygraph machine. However, she was free to leave and, had she requested to do so, the unrebutted testimony was that she would have been permitted to go. The testimony reflects that at some point in time while being connected to this machine, Mrs. Gordon requested that the various apparatus be removed. She did not, however, ask to leave at that time. No Supreme Court decision has ever equated custody with minor physical discomfort.

■ Because the court concludes that Mrs. Gordon's interrogation on November 17, 1985 was not custodial, *Miranda* warnings were not required. Because the warnings were not required, there can be no issue concerning whether a valid waiver of these *Miranda* rights occurred on November 17, 1985. The court cannot, however, conclude that Mrs. Gordon's interrogation on November 18, 1985 was non-custodial. After the interrogation concluded on that day, she was prevented from leaving the OSI offices and, at 1:00 p.m., was arrested by FBI agents. She was not, in fact, free to go during the morning session on that date. Her subsequent arrest converts the interrogation during that morning into a custodial interrogation. *See Oregon v. Elstad*, 105 S.Ct. at 1297.

### C. Knowing and Intelligent Waiver

This analysis will apply to Mrs. Gordon's *Miranda* claim as it concerns the validity of her waiver of rights on November 18,

1985. Because the court's inquiry into the validity of this waiver necessitates a review of the totality of the circumstances, the analysis of this section applies equally to the events of November 17, 1985, should an appellate court determine that Karen Gordon was entitled to have *Miranda* warnings read to her on November 17.

In its current term, the Supreme Court has reviewed the standard for determining the validity of any waiver of *Miranda* rights:

> Echoing the standard first articulated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 348 U.S., at 444, 475, 86 S.Ct., at 1612, 1628. The inquiry has two distinct dimensions. *Edwards v. Arizona, supra,* 451 U.S., at 482, 101 S.Ct., at 1883; *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* —— U.S. ——, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). In assessing whether the waiver of *Miranda* rights was knowing and voluntary, this court is instructed to assess the "totality of the circumstances".

> Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). See also *North Carolina v. Butler,* 441 U.S. 369,

374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979).

*Moran v. Burbine,* 106 S.Ct. at 1141. The jurisprudence on the issue of *Miranda* waivers identifies many factors which are relevant for the court's consideration: the conduct and attitude of the police, the length of interrogation, the isolation of the defendant, the mental and physical condition of the defendant, the background and experience of the defendant, the lack of counsel and the defendant's susceptibility to pressure.

Mrs. Gordon argues that her waiver of *Miranda* rights was neither voluntary nor knowing. She contends that her waiver was not voluntary because police coercion existed. Apparently, she argues that all contacts with the investigators constitute coercion. Karen Gordon also argues that psychological factors (including her mental and physical condition as well as her mental disorders) rendered her waiver of rights involuntary. Mrs. Gordon contends that her waiver of *Miranda* rights was not knowing because these same mental disorders and conditions prevented an understanding of the rights which she waived.

### 1 Psychological Evidence

Three experts testified at the suppression hearing. Dr. Andrew Mullen, a psychiatrist appointed by the court, testified that he diagnosed Karen Gordon as suffering from dependent personality disorder, dysthemic disorder, and alcohol abuse. Dr. Mark Vigen, a clinical psychologist, testified that his treatment of Mrs. Gordon led to the following diagnoses: dependent personality disorder, dysthemic disorder, post-traumatic stress syndrome, and alcohol dependency. Dr. Lenore Walker, a clinical psychologist with a sub-specialty in family violence, testified that it was her expert opinion that Mrs. Gordon suffered from battered woman syndrome, a sub-category of post-traumatic stress syndrome. This simple listing of the diagnoses of the various experts reveals that the evidence on this point was remarkably consistent. Dr. Mullen did not diagnose post-traumatic stress syndrome because he was not famil-

iar with the area and was, therefore, not comfortable in making such a diagnosis. (Tr. 1192.)

"Dysthemic disorder" was defined by the experts as depression. Individuals suffering from this disorder experience a loss of interest or pleasure. (Tr. 976, 1140.) They have feelings of hopelessness, do not enjoy doing things, have problems making decisions and concentrating, and may have appetite or sleep disturbances. (Tr. 976.)

The experts defined "dependent personality disorder" as a long-term, deeply-ingrained pattern of behavior. (Tr. 974, 1146.) Individuals suffering from this disorder passively allow others to assume responsibility and take control. They lack self-confidence, see themselves as helpless and are unable to function independently. (Tr. 974, 1147.) A dependent personality subordinates his own needs to those of the people on whom he relies. *Id.* The dependent personality is concerned with pleasing others. (Tr. 1147.) An individual suffering dependent personality disorder is very easily manipulated. *Id.* (The diagnosis of "alcohol abuse or dependency" is almost self-defining. Daily use of alcohol is needed for adequate functioning.)

"Post-traumatic stress disorder" is defined by the psychologists as an anxiety disorder. The symptoms develop following a trauma which is outside the range of normal human experience. (Tr. 1140–41.) A person suffering from post-traumatic stress disorder reexperiences the trauma and suffers a numbing of his ability to interact with the world. *Id.* These individuals may also have dysphoria or cognitive symptoms. *Id.* One such cognitive symptom was described as "disassociative state," which was described as being akin to *petit mal* or "absence" seizures. (Tr. 1141–42). Objectively, the person becomes unresponsive and stares vacantly. *Id.*

Battered women syndrome is a sub-category of the post-traumatic stress syndrome. (Tr. 525.) Research has identified five childhood factors and seven factors in a battering relationship which help identify a victim of this syndrome. Persons suffering battered women's syndrome often exhibit signs of "learned helplessness." (Tr. 527–31.) The battering relationship follows a cycle of violence which shows up in approximately 60 per cent of the cases. (Tr. 535–39.)

Extensive evidence was received by the Magistrate concerning the effect of these various mental disorders on Karen Gordon's ability to make a knowing and voluntary waiver of her rights. It is significant that all experts testified that Karen Gordon was not psychotic. (Tr. 978, 1194.) A psychotic individual is out of touch with reality. *Id.* While no one testified that Mrs. Gordon was out of touch with reality, the testimony was uniform that her various mental disorders affected the manner in which she responded to real life events. Dr. Mullen's testimony, based solely on his examinations pursuant to his appointment by the court, was the most general. Dr. Vigen's testimony, based on 30 to 50 hours of treatment since Mrs. Gordon's arrest, was the most specific. Dr. Walker's testimony, based on her extensive knowledge of the battered woman syndrome, was the most technical. The expert opinions of each of these witnesses will be examined at length.

Dr. Mullen testified that, in general, Karen Gordon understands what is happening around her and is able to appreciate the consequences of her actions. (Tr. 979.) Even though she understands what is going on around her, she is easily manipulated; however, as a general proposition, she would still understand the consequences of what she was doing while being manipulated. (Tr. 979.) When asked whether any of Mrs. Gordon's disorders would prohibit her from making a voluntary choice, Dr. Mullen responded: "I don't think they prohibit it. They may have some impact on such decision making, but they don't prohibit it." (Tr. 982.)

Dr. Vigen testified that, in his opinion, Karen Gordon could not make a voluntary waiver of her rights. (Tr. 1169.) Although he expressed some problem with the concept of "voluntariness," Dr. Vigen stated

that Mrs. Gordon felt that she had no option but to cooperate and please the OSI investigators. (Tr. 1169.) Based on what he felt were these predictable responses, Dr. Vigen stated that her waiver of her *Miranda* rights was not voluntary (Tr. 1169) and that, from a psychological point of view, it was predictable that she would go to the agents and talk. (Tr. 1172.) Dr. Vigen felt that Mrs. Gordon could be easily manipulated into talking (Tr. 1170), and that certain activities by the investigators such as the hand-holding on November 17, 1985, played on her dependent personality. (Tr. 1184.)

Dr. Vigen also testified that there was a similarity between the investigation procedures used by the OSI and FBI and the battering situation of Karen Gordon's home life. (Tr. 1170.) In Dr. Vigen's opinion, this similarity led to an "approach-avoidance conflict" in which Mrs. Gordon wanted to approach the investigators and get their approval while simultaneously sensing danger and wanting to avoid that danger. (Tr. 1170–71.) Dr. Vigen testified that the little bits of information which Karen Gordon gave out to the investigators over the course of their investigation was her response to this "approach-avoidance conflict." *Id.* These small pieces of information both pleased the investigators and, at least in Mrs. Gordon's mind, kept them at bay. *Id.* Dr. Vigen testified that, had Karen Gordon's interrogators been women, she could have resisted the attempts to elicit information more successfully. (Tr. 1188.)

Dr. Vigen does not believe that Karen Gordon can appreciate the long-term consequences of her actions. Rather, he testified that she focuses on what she perceives as a source of pain or danger. (Tr. 1174, 1201–04, 1212.) This focusing on the perceived danger leads Karen Gordon into an almost automatic behavior pattern in which she seeks to placate the individual responsible for generating that perceived pain or danger. *Id.* Dr. Vigen testified that Karen Gordon had strong feelings of lack of control. (Tr. 1176.) He testified that she does not have the options of normal people.

(Tr. 1198–99.) When confronted with Karen Gordon's comments that "if she talked, she would go to jail," and that she "had to make up a reason for refusing the polygraph," Dr. Vigen was troubled. He testified that the "jail" comment may indicate a verbal level of understanding, although he doubts that she truly comprehended what she was saying. (Tr. 1207–08.) He stated that her comment concerning her refusal to take the polygraph "possibly" indicates understanding on her part. (Tr. 1227.)

Finally, Dr. Vigen testified that Karen Gordon has a tendency to become disassociative when under stress. (Tr. 1213–15.) He testified that during these disassociative states, Karen Gordon would become numb and unresponsive. *Id.* However, Dr. Vigen testified that an untrained person would not notice these brief, disassociative states. (Tr. 1232, 1234.)

Dr. Walker testified concerning the impact of the battered woman syndrome on Karen Gordon's ability to make a knowing and voluntary waiver of her *Miranda* rights. A battered woman was defined as one "who is coerced into doing something a man wants her to do without regard for her rights. The coercion is usually physical, sexual or psychological abuse." (Tr. 524.) "Battered woman syndrome" was defined as:

> A battered woman's syndrome is the psychological effect of what happens to a woman when she is battered, when she is physically, sexually or psychologically abused. Battered woman syndrome is a collection of psychological symptoms. They are classified in the *Diagnostic and Statistical Manual of Mental Disorders*, the Third Edition, at a sub-category of Post-Traumatic Stress Disorder. The symptoms usually include a change in the way people relate to other people .... for example some hyper-vigilance to abuse or further violence. They are very sensitive to the fact they may be in danger and then they begin to behave in what we call a survival mode rather than

as a normal person might react to such a situation they may consider dangerous. (Tr. 524–25.) Dr. Walker testified that two theories have been tested in relation to battered woman syndrome: the learned helplessness theory and the cycle of violence theory.

In defining the learned helplessness theory, Dr. Walker described rat, dog and human experiments in which the subject did not have continual control over the given stimulus (being held, electric shock, loud noise). (Tr. 527–31.) This lack of prediction as to whether the pain would occur is described as "non-contingent control." The subjects put into these non-contingent control situations became passive, i.e., "became conditioned to believe that they couldn't protect themselves anymore and they would do fewer and fewer things to try to stay safe." (Tr. 528.) They "believed there was nothing they could do to stop the shock...." Id. "They lost their free will from that kind of conditioning process and that's part of the learned helplessness." (Tr. 529.) Dr. Walker found that women suffering from battered woman syndrome are also put into a non-contingent control situation. Sometimes the woman will be hurt and sometimes she will not be hurt; consequently, "she loses her prediction of whether she can protect herself." (Tr. 531.)

Dr. Walker and others studying the battered woman syndrome were able to develop, from statistics, "five factors in childhood and seven factors from a battering relationship that, if present, was [sic] related to learned helplessness that we could measure with psychological interviewing and psychological tests...." (Tr. 531.) The childhood factors are:

1. Witnessing or experiencing battering in the home;
2. Sexual abuse or molestation as a child;
3. Non-contingency experiences (not being able to tell whether natural responses will protect one);
4. Rigid traditional values (e.g., little girls cannot protect themselves and little girls cannot get angry); and

5. Significant illness as a child.

(Tr. 532.) The factors from the battering relationship are:

1. The relationship follows a cycle of violence;
2. There is sexual abuse in the relationship;
3. There is psychological jealousy and possessiveness (the batterer fears the woman's involvement with others and wants to control her person and mind);
4. Threats to kill have been made;
5. Psychological abuse exists;
6. There are violence correlates (there is other violence in which the woman knows the batterer has engaged—children, fights in bars and/or hitting other women); and
7. Alcohol or drug abuse.

(Tr. 533–34.) Dr. Walker testified that this learned helplessness theory explains why women stay in an abusive relationship. Id. She described this learned helplessness as "a woman's loss of her voluntary will." (Tr. 534.) These women "go into a survival mode to learn to cope. ... They can do that quite well but they can't really escape." (Tr. 535.)

Dr. Walker also explained the cycle of violence theory. The violence in a battering relationship has "a significant pattern" which may be isolated into three separate phases. (Tr. 535.) The first phase is a tension-building period; the second, the violent explosion or acute battering incident; and, the third, a period of loving attrition. During her testimony, Dr. Walker drew a graph of this cycle of violence which dramatically demonstrated the build-up of tension during small, isolated incidents leading to a final explosion. After this explosion, Dr. Walker's graph descended to a level of no tension. She defined a period of "inevitability" in which "the woman recognizes there is so much tension that unless there is total separation, or something happens, there is going to be an explosion. And there is not much anybody can do to stop it, and, at that point, some women may actually push it to an explosion because they

can't stand the tension and because it might be safer if they can [determine] the time and place that it happens; so, they may actually do something that seems counter-productive to them but is basically very productive if you think about it in terms of getting the least amount of hurt." (Tr. 537.)

Dr. Walker testified that, in her opinion, Karen Gordon was suffering from battered woman syndrome. She testified that Mrs. Gordon exhibits symptoms of learned helplessness; and the doctor was able, at the hearing, to testify to finding three childhood factors (non-contingency, traditional values and significant illness) and all seven relationship factors.

Based on the battered woman syndrome and the cycle of violence and learned helplessness theories, it was Dr. Walker's opinion that Karen Gordon's waiver of her *Miranda* rights was not voluntary. (Tr. 548–49, 564.) In Dr. Walker's opinion, the learned helplessness explained why Karen Gordon's waiver was not voluntary and knowing. Dr. Walker testified that on November 17 and 18, Karen Gordon was acting in a "survival mode" and that she was not free to "escape." (Tr. 548–50.) In Dr. Walker's opinion, Karen Gordon was not looking at the long-term consequences of her actions. *Id.* Karen Gordon perceived the interrogation as abusive and dangerous, and this led her to react involuntarily, as someone who has learned helplessness. (Tr. 543.) The cycle of violence theory explained why, in Dr. Walker's opinion, Karen Gordon's decision to waive her *Miranda* rights was, in essence, coerced. Dr. Walker testified that the investigation recreated the cycle of violence which Karen Gordon experienced in her marital relationship. (Tr. 553–55, 563.) Dr. Walker traced a tension-building phase, an acute battering incident, as well as a period of attrition. In Dr. Walker's opinion, Karen Gordon was in a period of inevitability and had no choice but to take the polygraph. (Tr. 563.) Dr. Walker testified that Karen Gordon, as a battered woman, would have perceived the polygraph and Agent Walker's acts of friendship, such as holding her hand when

she became upset, as sexual harassment. (Tr. 545–46.)

Perhaps Dr. Walker best summarized her testimony when she stated: "[D]uring that period of time [Karen Gordon] was incapable ... of voluntarily and knowingly waiving her rights and any statements that she made ... were made out of the state of mind of a battered woman suffering from battered woman's syndrome." (Tr. 564.) Dr. Walker explained both her general conclusions concerning "voluntariness" and "knowingness," as well as many smaller incidents over the relevant three-week time period in terms of the battered woman's syndrome. It is unnecessary to describe all of these events which Dr. Walker explained as the product of the battered woman's syndrome. Most significantly, however, Dr. Walker testified that people without experience with the battered woman's syndrome would not recognize or understand the responses of a battered woman. (Tr. 544.)

### 2 Applying the Law

The nature and source of the psychological disorders summarized in section C–1, *supra*, emphasize the difficulty of rendering a decision unclouded by emotion. Nonetheless, this court must avoid fulfilling the prophecy that "hard facts made bad law." In perhaps the most devisive *Miranda* case heard by the Supreme Court in the last decade, Justice Stevens wrote:

> The emotional aspects of the case make it difficult to decide dispassionately, but we do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us.

*Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 1247, 51 L.Ed.2d 424 (1977) (Stevens, J., concurring). In deciding this case, the court will adhere to Justice Stevens's tripartite reminder to rule unemotionally, to seek justice in the case at bar, and to render a decision which may be fairly and surely applied in the future.

#### (a) Coercion

Considering the totality of the circumstances in the instant case, this court finds

that no coercion was involved in Karen Gordon's waiver of her *Miranda* "rights" to remain silent and to have the presence of counsel. The entire investigation was conducted with a solicitous attitude toward Mrs. Gordon. If anything, the conduct which Mrs. Gordon attacks in her brief was the complete opposite of that of which criminal defendants typically complain: the investigators were too nice. The court finds that the investigators were friendly, not in a false, ingratiating manner, but rather out of genuine concern. After all, Karen Gordon was not a suspect. They did not overstate their case; in fact, they told her that she held the "direction" for their investigation. The OSI agents did not employ "Mutt and Jeff" tactics; if different agents were involved, they were chosen at Mrs. Gordon's request. She chose to speak to Agent Gravelee Sunday afternoon on November 17. She chose to return to the OSI offices that evening and to talk to Agent Walker there. She specifically requested Agent Walker's presence during the monitored calls on Monday, November 18. Nor does objective evidence of sexual harassment exist. Agent Walker placed his hand on Karen Gordon's during the post-test interview on November 17, and *she* clamped his fingers and held on for twenty minutes. This court cannot transform this incident or the various apparatus of the polygraph machine into proof of sexual harassment. In fact, the OSI agents went to great lengths to avoid even the appearance of such harassment: a female observer was present for the polygraph examination, and agent Walker refused to accompany Mrs. Gordon to lunch alone on Monday, November 18.

There is a complete absence of other typical indicia of coercion during interrogation. Mrs. Gordon was not held incommunicado on November 17 and 18. She may not have called or contacted anyone while at the OSI office; nevertheless, the fact remains that she was free to leave at anytime on November 17. Mrs. Gordon did see her friend Rosa Terry on Monday morning, November 18. She was free to use the telephone that evening at the FBI office. She was consistently offered food and drink; *she* declined. She was permitted to smoke, and breaks were arranged for this purpose in the post-polygraph interviews. Karen Gordon was not observed to be, nor does she claim to have been, intoxicated during the periods when she was questioned by OSI and FBI agents. From the record, it appears that she does not have a diminished educational level and that she was able to function well in her job prior to her husband's death.

The OSI and FBI investigators had no knowledge of Karen Gordon's mental disorders. The experts testified that untrained persons would be unable to perceive the reactions of a person suffering post-traumatic stress syndrome or battered woman's syndrome. Without the ability to recognize these disorders, it is difficult for this court to fathom how the investigators would be in a position to exploit them. Clearly, the most "exploitive" act on the part of the OSI occurred Sunday afternoon when Agent Gravelee placed pictures of Sgt. Gordon's body at Karen Gordon's feet with the question, "Would you let someone leave him to the animals like that?" It is not known whether she even looked at the photographs. This action on the part of Agent Gravelee was nothing less than a rather obvious play on Mrs. Gordon's expressed feelings for her husband; it was, also, nothing more. This court cannot, on the record before it, rule that this single offensive incident is so egregious that two separate days of otherwise proper investigation must be deemed "tainted" and "coercive." In the panoply of investigatory misconduct, Agent Gravelee's photograph ploy appears rather mild-mannered. *See Miranda v. Arizona,* 86 S.Ct. at 1615–17 (discussing isolation tactics, false line-ups, "Mutt and Jeff" interrogation, false statements of police over-confidence in suspect's guilt, interrogation which continues for days on end, and coercive commentary on an accused's assertion of his rights to silence or counsel).

Legal precedent and sound policy support this court's conclusion that there was

no coercion involved in this case. The *Miranda* rule demonstrates a judicial concern over police misconduct and abuse. Neither *Miranda,* nor the Fifth Amendment values which it protects, may be read as prohibiting confessions where there is no official coercion. The *Miranda* opinion, itself, is littered with comments and citations which illustrate that Court's concern for abusive investigatory tactics. 86 S.Ct. at 1613, 1619–20, 1630–31. Two decades later, Supreme Court opinions continue to reaffirm that *Miranda* guarantees that an individual should remain free from compulsion at the hands of government agents:

> The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially *coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions."

*New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 2630–31, 81 L.Ed.2d 550 (quoting *U.S. v. Washington,* 97 S.Ct. at 1818) (emphasis by *Quarles* court). *See also Oregon v. Elstad,* 105 S.Ct. at 1296 ("absent deliberately coercive or improper tactics," an unwarned admission will not taint voluntariness of second, warned confession). In this case, the court is simply not confronted with the same level of deliberate, intentional and objectively qualifiable, investigatory coercion as that condemned in *Miranda* and its progeny.

■ If coercion exists in this case, it is the by-product of the mental disorders which are said to afflict Karen Gordon. Sound policy dictates that, absent police exploitation of a known mental susceptibility, there can be no violation of *Miranda* or the Fifth Amendment. This policy is made clear by two recent cases in which the Supreme Court decided whether incriminating statements were made in response to police interrogation. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977): *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

In *Brewer,* the defendant was an escaped mental patient known to have strong religious convictions. While defendant, Wil-

liams, was being transported by automobile back to Des Moines, Iowa, after arraignment, a twenty-year police veteran addressed him as "Reverend" and asked him to think about the little girl in the snow and how her parents deserved a decent "Christian burial." The Supreme Court ruled that this constituted interrogation and that, under the circumstances, the defendant had not waived his right to counsel under *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *See Brewer v. Williams,* 97 S.Ct. at 1242–43; *see also id.* at 1244 (Marshall, J., concurring) ("It is this intentional police misconduct—not good police practice—that the Court rightly condemns.")

The result in *Brewer* must be compared with that of *Innis.* In *Innis,* the defendant was picked up by the police in connection with an armed robbery perpetrated with a sawed-off shotgun. Innis was apprehended in a neighborhood which included a school for handicapped children. The arrest was made shortly after the crime was committed; however, Innis did not have the shotgun with him when he was caught. Innis was read his *Miranda* rights and, while being transported to the police station, he overheard the conversation of two officers: "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." 100 S.Ct. at 1686. The Court ruled that no interrogation was involved and noted:

> But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

100 S.Ct. at 1690. The Court also acknowledged that police knowledge of any "unusual susceptibility ... to a particular form of persuasion" would be an important factor in determining whether the police

should have known that their tactics constituted interrogation. *Id.* at n. 8.

■ The policy implications are clear in these two cases. Knowing exploitation of a mental condition will likely run afoul of *Miranda* or its Sixth Amendment companion case, *Massiah.* Inadvertent and unforeseen psychological pressure exerted by police conduct will not do so. In this case, not only did the police, in fact, lack knowledge of Mrs. Gordon's psychological disorders, but the experts also testified that they could not have been expected to know of them. To rule that un-knowing, subtle compulsion may vitiate a waiver of rights would rip *Miranda* from its ties to the Fifth Amendment which guarantees that the *government* may not compel a citizen to be a witness against himself.

(b) Mental Disorders/Susceptibility to Pressure

A most imperfect fit exists between law and psychiatry. Nowhere is that more clear than in this case. The court does not doubt the accuracy of the experts' *psychological* diagnoses; however, the court cannot accept their *legal* conclusions concerning the validity of Mrs. Gordon's waiver of her Fifth Amendment *Miranda* rights.

■ As noted above, the court's inquiry is two-fold: the waiver must be voluntary and it must be knowing, viewed in the totality of the circumstances. Yet, in assessing the totality of the circumstances, the court should never lose sight of the fact that these *Miranda* "rights" have their origin in the Fifth Amendment which guarantees that the government may not force any citizen to be a witness against himself. Absent improper government conduct, there can be no Fifth Amendment —and, *ipso facto*, no *Miranda*—violation. *See Oregon v. Elstad*, 105 S.Ct. at 1291, 1293, 1296; *New York v. Quarles*, 104 S.Ct. at 2630. The lack of improper government conduct seriously undermines the legal conclusions offered by Drs. Vigen and Walker.

The Supreme Court has addressed the issue of psychological coercion in the context of valid waivers of *Miranda* rights. The *Miranda* Court explicitly disapproved and rejected government overreaching through psychological coercion brought about by certain interrogatory tactics, for example, false line-ups in which fictitious victims accuse the suspect of non-existent crimes. 86 S.Ct. at 1615–17. As discussed above, these types of tactics were not used against Mrs. Gordon. Rather, if psychological coercion occurred in this case, it is a product of her mental state as a battered woman and dependent personality.

The Supreme Court has also had the occasion to assess this type of self-generated psychological coercion in *Oregon v. Elstad, supra.* That case involved the issue whether a second confession given after *Miranda* warnings were issued should be deemed "coerced" because the defendant made incriminatory admissions in response to police questioning without having been read his rights. That defendant alleged that once the "cat is out of the bag," psychological coercion exists which tainted his second fully warned confession. The Supreme Court flatly rejected this analysis. The *Elstad* Court ruled:

> The Fifth Amendment, of course, is not concerned with ... moral and psychological pressures to confess emanating from sources other than official coercion.

105 S.Ct. at 1291 (citing *Beheler*, 103 S.Ct. 3517; *Innis*, 100 S.Ct. 1682; and *Mathiason*, 97 S.Ct. 711). The Court noted:

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case.... It is difficult to tell with certainty what motivates a suspect to speak. A suspect's confession may be traced to factors as disparate as "a prearrest event such as a visit to a minister," *Dunaway v. New York*, 442 U.S., at 220, 99 S.Ct. at 2261 (STEVENS, J., concurring), or an intervening event

such as the exchange of words respondent had with his father. We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.

105 S.Ct. at 1295–96. The psychological pressures which Karen Gordon claims "taint" her waiver of rights and made that waiver involuntary emanated from her own mind. *Elstad* makes it clear that this type of psychological pressure does not make a waiver of rights involuntary.

There are strong policy concerns which mitigate against extending *Miranda* to include self-generated psychological pressures. Such an extension would have the "inevitable consequence of muddying *Miranda's* otherwise relatively clear waters." *Moran v. Burbine*, 106 S.Ct. at 1143. One of the principal advantages of the *Miranda* rule is its "ease and clarity of application." *Id.; see also Rhode Island v. Innis*, 100 S.Ct. at 1691 (Burger, C.J., concurring). The potential "muddying" of *Miranda* is strongly evident in this case. For example, Dr. Vigen testified that Karen Gordon would probably have been able to resist questioning by the OSI *if* her interrogators had been female. It would be an unconscionable burden on law enforcement officials to tie the admissibility of lawfully obtained confessions to the gender of the officer obtaining the statement. Of course, this is but one small bit of the psychological evidence introduced at the hearing. It is not cited to trivialize Mrs. Gordon's claims or Dr. Vigen's opinions— merely to illustrate the slippery path which acceptance of Karen Gordon's argument would necessarily open.

The public has an interest in confessions. " 'Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable....' " *Elstad*, 105 S.Ct. at 1291 (citing *U.S. v. Washington*, 97 S.Ct. 1814). There is no reason to shift the balance between society's rights and an individual's

because of the individual's psychological idiosyncrasies. People confess for many, many reasons: guilt, braggadocio, feelings of moral certainty, shame, and perhaps even for the notoriety of the act. It would be difficult, if not impossible, for a court to rule in any of these instances exactly where these inward pressures to confess overcame the individual's will to such an extent that any statement was involuntary—as a matter of law, or of fact. The emotional aspect of Karen Gordon's inward compulsions to talk makes hers a difficult case; however, legally, the argument which she makes is no different from that of the person who confesses because of guilt, shame, the wish to attain notoriety or any other personal reason.

Karen Gordon also argues that her psychological disorders prevented her Fifth Amendment rights from being knowingly and intelligently waived. This argument must also be rejected. The *Elstad* Court noted: "This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness." 105 S.Ct. at 1297 (citing *Beheler*, 103 S.Ct. 3520; *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). The *Elstad* opinion continues with the observation that "we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case." 105 S.Ct. at 1297–98. While the experts testified that, at worst, Mrs. Gordon's disorders would bar a knowing waiver of her rights and that, at best, they would impair her ability to do so, the court does not believe that the psychologists and the law are concerned with the same type of "knowing" waiver. The law does not require a *complete* comprehension of all of the possible ramifications of making a statement. *See Oregon v. Elstad, supra.*

The record is replete with indications that Karen Gordon understood what she was doing when she spoke to the OSI on

November 17 and 18. On those two days, Mrs. Gordon indicated that, if she talked, she could go to jail and she could possibly lose custody of her children. She even indicated this fear of arrest to her close, personal friend the day before the first polygraph examination. She understood and asked questions about how the polygraph machine could detect her reaction to the names on the wall. She was also capable of terminating her interviews when she wished—for example, her Sunday afternoon interview with Agent Gravelee. There are other indications that Karen Gordon was not acting like the pliable zombie portrayed in the defense arguments. She was capable of avoiding the polygraph test on November 15 by fabricating derogatory information about an OSI polygraph examiner; she was capable of understanding how and why she might fail that test and explained this to FBI Agent Aiken. She was capable of laying false trails for the OSI to follow. She was capable of demanding beer when she wanted it.

■ Thus, this court concludes that, under the totality of the circumstances, the government has proven that Karen Gordon's waiver of her *Miranda* rights in talking to the OSI and FBI agents was knowing and voluntary. The *Miranda* Court stated:

> There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

86 S.Ct. at 1630. If this statement is to have any meaning, then Karen Gordon's statements—particularly those of November 17, 1985—must be deemed admissible. There is a strong tendency to judge an individual's confession with the 20/20 vision of hindsight and to think: "Dummy, why'd you do it?" Dr. Walker certainly demonstrated this type of thinking when she stated: "If she really did [know what she were doing,] then she would not have continued talking...." (Tr. 612.) Under this type of analysis, no confession would be admissible! However, that is not the standard which the law applies. When reviewed in the light of legal precedent, this court must rule that the waiver of *Miranda* rights was valid.

### D Due Process—Voluntariness

Karen Gordon's final argument is that introduction of her statements at trial will violate the Fifth Amendment's Due Process Clause because she claims that those statements were not voluntary. After a review of *nearly* 40 years of its due process decisions, the Supreme Court concluded that those "cases yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). After a review of *over* 40 years of this jurisprudence, this court concludes that there is no special litany of words to use; the Supreme Court has employed various phrases to define the concept of "voluntariness" under the Due Process Clause: "free and unconstrained choice," *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); "freely self-determined," *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); "rational intellect and free will," *Blackburn v. Alabama,* 80 S.Ct. 274 (1960); "product of any meaningful act of volition," *id.;* and "whether the defendant's will was overborne at the time he confessed," *Lynumn v. Illinois,* 83 S.Ct. 917 (1963). Justice Frankfurter called the notion of "voluntariness" an "amphibian." *Culombe,* 81 S.Ct. at 1880–81. Justice Stewart recognized that "neither linguistics nor epistemology will provide a ready definition of the meaning of 'voluntariness'":

> It cannot be taken literally to mean a "knowing" choice. "Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are 'voluntary' in the sense of representing a

choice of alternatives. On the other hand, if 'voluntariness' incorporates notions of 'but for' cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind."

*Schneckloth,* 93 S.Ct. at 2046. The Fifth Circuit has reached the following synthesis of the "voluntariness" test:

Those statements may be synthesized to require that in order to find [defendant's] confession voluntary, we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.

*Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir.1980) *(en banc).*

■ The determination of the voluntariness of a confession requires the court to consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth,* 93 S.Ct. at 2047. Important factors for the court's consideration include:

1. The length of the detention, *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472 (1940);

2. Repeated and prolonged nature of the questioning, *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944);

3. The number of interrogators, *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Ashcraft, supra;*

4. The time and place of the interrogation, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Spano, supra;*

5. Isolation of the defendant from family, friends and counsel, *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978);

6. Use of physical punishment such as deprivation of food or sleep, *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961);

7. Threats, *Lynumn v. Illinois, supra;*

8. Failure to advise the defendant of his constitutional rights, *Davis v. North Carolina, supra;*

9. Police intent in interrogation, *Spano, supra; Jurek, supra;*

10. Whether the questioning continued despite an unwillingness to admit guilt, *cf. Stroble v. California,* 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952);

11. Disregard for any applicable law, *Culombe, supra;*

12. The physical condition of the suspect, *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963);

13. Youth of the accused, *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948);

14. Lack of education, *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958);

15. Low intelligence, *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); and

16. Mental condition of the suspect, *Blackburn* and *Townsend, supra.*

These factors may be roughly divided into two categories: those factors concerning the nature of the interrogation and those concerning the individual under interrogation. Both groups of factors will be considered in turn.

■ As noted above in the discussion considering the voluntariness of Mrs. Gordon's waiver of her *Miranda* rights, the environment of her interrogation on the days in question was not inherently coercive. The time, place and manner of the questioning was reasonable. While the total time spent at the OSI and/or FBI offices was lengthy, there are several mitigating considerations. First, not all of that time was spent in interrogation. The individual sessions of questioning were reasonable. Second, it must be remembered that some of these sessions were at Mrs. Gor-

don's request and with the agent of her choice. They terminated at her request, and on Sunday evening, November 17, 1985, she even indicated that she was willing to continue when the agent involved stated that it was too late to do so. Third, Karen Gordon was not in custody on November 17. This court cannot support a finding of "prolonged and repeated questioning" on the record before it. Every contact that Karen Gordon had with the OSI or FBI cannot be considered an interrogative event. She was not a suspect until she made her incriminating statements on Sunday afternoon and evening. All prior contacts were interviews with the spouse of a murder victim. Furthermore, Mrs. Gordon did not complain about any of these contacts to her friends, co-workers or Col. Price. The OSI and FBI did not demonstrate an overwhelming show of force by employing numerous interrogators. In fact, most of her interviews were one-on-one sessions with a single agent. While the interrogations were held at either the FBI or OSI offices, they were not held in an unreasonable place or at an unreasonable time. It is true that the polygraph room, as described, appears to be a particularly barren environment; however, it was designedly so for a legitimate purpose. Karen Gordon was not kept there, nor were all of her interviews conducted there. Even more importantly, she was free to leave at any time during the interviews on November 17.

The coercion factors typically found in the jurisprudence are conspicuously absent in this case. Mrs. Gordon was not isolated from friends, family or counsel. She was advised throughout the period following her husband's death by friends, co-workers, her unit commander, and Col. Price. She never asked for, and she was never isolated from, counsel. There was no physical punishment or threats of physical punishment. While it is true that Mrs. Gordon did not appear to eat on the two days in question, this was not because the agents prevented this. She was permitted to smoke and, on Sunday evening, the OSI agents procured beer for her at her express demand. Mrs.

Gordon was repeatedly advised of her rights by both the OSI and the FBI. The evidence demonstrates that the agents went to great lengths to ensure that she understood them and attempted to see that she fully appreciated the fact that she had the right to refuse to cooperate. The questioning which led to her most revealing and incriminating admissions was not motivated by a reprehensible intent. Agent Gravelee's "appeal ... to [Mrs. Gordon's] empathy and emotions was not an unacceptable interrogation tactic." *Moran v. Blackburn*, 781 F.2d 444, 446 (5th Cir.1986). On Sunday evening, Agent Walker did not know that Karen Gordon was involved in the murder of her husband. He was not aware of what she had told Agent Gravelee. He testified that her polygraph could mean either involvement in the murder or that she was withholding information and being less than truthful. One of the valid purposes of police questioning is to exonerate the innocent. *See Schneckloth*, 93 S.Ct. at 2046. Further, the monitored calls of Monday evening were not for the purpose of gathering additional information on Mrs. Gordon, but, rather, were for the purpose of "making a case" against David Woodcock. Karen Gordon was willing to talk to the OSI agents. She initiated the conversation with Agent Gravelee and she would have continued the session with Agent Walker past the moratorium which he set. Finally, the evidence at the suppression hearing demonstrated *no* disregard for any applicable laws.

The consideration of the factors concerning the mental and physical condition of Mrs. Gordon raise much more difficult problems. Evidence was introduced which shows that Karen Gordon suffers a number of physical ailments. She demonstrated a dramatic weight loss prior to and following her husband's death. She has stomach problems and has an alcohol dependency. However, there was no direct evidence of the effect of these ailments on her ability to undergo questioning by the investigating officials. The agents who questioned her never detected an impair-

ment; and, indeed, she outlasted Agent Walker on Sunday evening and exhibited sufficient presence of mind to perform two successful monitored calls on Monday night.

Karen Gordon is not young or inexperienced. She is a 29–year-old mother of three and a technical sergeant in the Air Force Reserves, who had a full-time job at Barksdale Air Force Base. There was absolutely no evidence to suggest that she has either an educational or intellectual deficiency.

The record, however, is extensive concerning Mrs. Gordon's mental condition. During the relevant time period, she had recently buried her husband who was found murdered, faced the possibility that she could lose custody of her children due to her failure to report or prevent child abuse in her home, and had to cope with the various mental disorders diagnosed by the expert witnesses.

Counsel for Mrs. Gordon, in their brief, argue that she is particularly susceptible to police interrogation. The psychological evidence demonstrates that she is subject to being manipulated. Drs. Vigen and Walker testified to the various internal psychological pressures which compel Karen Gordon to speak (*e.g.*, approach-avoidance conflict, placation by a battered woman). The Supreme Court has not confronted this type of psychological pressure in the context of a due process voluntariness issue. This is not the typical case where the psychological coercion which the court assesses derives from police tactics. *See, e.g., Spano v. New York, supra.* From an objective point of view, the police conduct was not, in itself, inherently coercive. This is not the case where the confession was made when a defendant was psychotic and out of touch with reality. *See, e.g., Blackburn v. Alabama, supra.* Nor is this a case where the defendant was drugged or so worn down by the police to the point where the court questions the defendant's ability to act independently and fears that he would have confessed to anything. *See, e.g., Townsend v. Sain* and *Jurek v. Es-*

*telle, supra.* The record of this case will simply not support a finding that Mrs. Gordon was out of touch with reality or worn down by the investigators at the time she made the inculpatory admissions.

This court is confronted with the unique and more difficult case of self-generated psychological compulsion, and the obligation to uphold the Due Process Clause requires this court to answer this question: Considering the totality of the circumstances, were Mrs. Gordon's admissions voluntary? This court believes the answer must be affirmative.

In section C(2) above, the potential coerciveness of police conduct and the "voluntariness" and "knowingness" of Karen Gordon's waiver of her *Miranda* rights was extensively discussed. The same factors which convinced the court that her waiver was voluntary also serve to convince that her confession was made voluntarily. It is beyond cavil that Karen Gordon fully realized the impact of her decision to reveal her role in her husband's death. She told various OSI agents that she could go to jail or lose custody of her children. She was warned of these possible consequences by friends and by the investigators. She was not manipulated or "tricked" into making her statements. The FBI and OSI lacked the knowledge to even recognize her mental disorders. Her statements were a product of a meaningful act of volition. Undoubtedly, a complex series of mental and emotional processes were at work in this decision. Nevertheless, the end product was Karen Gordon's choice. It must be remembered at all times:

> [T]hese confessions were not voluntary in the sense that [the defendants] wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

*Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953). On this record, it is clear that Karen Gordon's will was not overborne, or, if so, it was only overborne by her own mental make-up—a

mental make-up in which she was never divorced from reality. The investigators, by their conduct, did not overbear her will. *See Moran v. Blackburn*, 781 F.2d at 446–47.

Sound policy supports this court's conclusions. "Voluntariness" is not an issue severed from societal considerations:

> "[V]oluntariness" has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws.... Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished.... At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.

*Schneckloth v. Bustamonte*, 93 S.Ct. at 2046. A fair balancing of these interests in this case support the admission of Mrs. Gordon's statements. Further, this court finds no violation of the principles behind the suppression of statements under the Due Process Clause. There is no reason to believe that Mrs. Gordon's statements are untrustworthy, nor are they the product of improper inquisition or police misconduct.

From a purely philosophical point of view, the theory of the defense (stripped of any attempt to put it in the terminology of our legal system) is that, when it comes to responding to males in certain situations, Karen Gordon is a woman without a will. With no will, *ipso facto*, she cannot make a voluntary statement.

In a college ethics course or a law school jurisprudence class, this theory would be provocative material for discussion, papers and exams. However, when this issue is translated to the sphere of legal, rather than philosophical resolution, the result is clear. It is not psychology which establishes the norm for determining whether someone has a will—it is society which enforces its collective judgment through its legal system. This case only illustrates the wide gulf which separates law and psychology (or even medical knowledge). Dr. Vigen stated that post-traumatic stress syndrome has its origin in trauma outside the realm of ordinary human experience. Karen Gordon, with her mental composition, is outside the realm of the ordinary legal experience as well. The concept of "will" is central to our civilization and law. A human being without a will is simply foreign to our societal institutions.

The admissibility of Karen Gordon's statements must be tested in the crucible of our legal system, no matter how imperfect. Our nation is based on the rule of law; and, under that rule, her statements can only be considered as volitional acts. Karen Gordon knew that revealing her role would mean arrest, possible incarceration and potential loss of her children. She made these statements to her friends outside the interrogational environment. Despite this knowledge, she confessed. Her most damning admissions were made without any active prompting by the OSI. On Sunday evening, November 17, 1985, the OSI left her alone in the parking lot and told her she did not have to return; she chose to return. On Monday, November 18, 1985, Agent Walker gave up on getting her to name David Woodcock and left the room; she chose to run after him and reveal Woodcock's identity. These choices are legally sufficient to support a finding that Mrs. Gordon's admissions were the product of "rational intellect and free will." This court must agree with the Chief Justice that "[a]t times, it seems, the judicial mind is in conflict with what behavioral—and theological—specialists have long recognized as a natural human urge of people to confess wrongdoing." *Michigan v. Jackson*, —— U.S. ——, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986) (Burger, C.J.

concurring). At this time, in this case, no such conflict is called for.

## III CLAIMS BY DAVID WOODCOCK

The suppression claims of David Woodcock are directly tied to the claims made by Mrs. Gordon. Woodcock seeks to suppress three types of evidence. First, he seeks to suppress all oral and written statements of Karen Gordon because they were involuntary or because her waiver of *Miranda* rights was not knowing and voluntary. Second, he seeks to suppress the tape recordings of their monitored telephone calls because her consent to these calls was not valid. Third, he seeks to suppress all evidence obtained on the basis of a search of his home because the warrant authorizing that search was obtained solely on the basis of what Woodcock claims are involuntary statements by Karen Gordon. Each of these claims fail.

■ The court has now exhaustively discussed the validity of Karen Gordon's *Miranda* and due process claims. Thus, David Woodcock's first claim must, likewise, fail. This court is not even convinced that he had standing to assert these claims in the first place. The court specifically finds that Karen Gordon gave a valid consent to the monitored tape recordings of her phone calls to David Woodcock on November 18, 1985. This finding is based on the same facts which led the court to conclude that she executed valid waivers of her *Miranda* rights on that date. Further, FBI Agent Aiken made it clear to Mrs. Gordon that the decision to participate in these phone calls was strictly up to her and that she had no obligation to assist them. Because Mrs. Gordon's statements are admissible, the warrant authorizing the search of David Woodcock's house is based on valid evidence and, therefore, any evidence obtained in that search is admissible.

An Order consistent with the terms of this Memorandum Ruling shall issue herewith.